Argued January 17, reversed February 6, 1917.

# COOS *v.* COOS.*

(162 Pac. 860.)

**Divorce—Cruel and Inhuman Treatment—Evidence—Sufficiency.**

1. Evidence *held* to show such cruel and inhuman treatment by abusive cursing, ill temper and lack of support as to warrant decree of divorce for the wife.

[As to cruelty as ground for divorce, see notes in 29 Am. Dec. 674; 73 Am. Dec. 619; 40 Am. Rep. 463; 51 Am. Rep. 736; 65 Am. St. Rep. 69.]

From Yamhill: HARRY H. BELT, Judge.

Department 2.    Statement by MR. JUSTICE MOORE.

This is a suit by Carrie Coos against J. A. Coos for a divorce on the ground of cruel and inhuman treatment and personal indignities rendering her life burdensome, and for the custody of their daughter, Margaret, who was four years old when the suit was commenced. The cause, being at issue, was tried, and the suit dismissed, from which decree the plaintiff appeals.      REVERSED AND REMANDED.

For appellant there was a brief and an oral argument by *Mr. B. A. Kliks.*

For respondent there was a brief over the name of *Messrs. McCain, Vinton & Burdett,* with an oral argument by *Mr. James E. Burdett.*

MR. JUSTICE MOORE delivered the opinion of the court.

It appears from the testimony given at the trial that the parties were married March 4, 1909. Prior there-

---

*On profanity and obscenity as grounds for divorce, as cruel and inhuman treatment, see note in 12 L. R. A. (N. S.) 820. REPORTER.

to the plaintiff had been engaged in a department store, fitting ladies' ready-made gowns and coats. The defendant then was a logger, and for some time thereafter he continued in that business, his wife residing with him at lumber camps. She testified that about three months after her marriage the defendant began growing cross and disagreeable toward her, which conduct continued until March 29, 1915, when she was obliged to leave him, taking the child with her to the home of a relative. The first year of their marriage the company employing the defendant failed in business, and he lost thereby about one half of the wages which he had earned. Owing to the sluggish condition of the lumber market on the Pacific Coast in subsequent years the former activity in the timber business was retarded, and the defendant was obliged to seek employment in other fields of labor in which he took but little interest, and in consequence thereof he worked but a short time at any one place. As the support of himself and family was derived from his wages, his failure continuously to pursue any occupation necessarily reduced those depending upon him almost to a state of penury. The plaintiff testified that in the six years during which she lived with her husband he purchased for her articles of wearing apparel the prices of which did not exceed $52, and that the clothing which she possessed at the time of her marriage was, after many turnings of the material, so much worn that she became destitute, whereupon her sister gave her $25, which sum of money she used in replenishing her wardrobe. In answer to the inquiry as to what statements the defendant made to the plaintiff in reference to her leaving him she testified:

"He told me a number of times, when he would be acting bad, that if he didn't suit me, I could get up and

go; that he would be a damned sight better off without me.

"Q. Was this on the one occasion of your going to leave, or before that?

"A. Before that, a number of times. He once got mad because I owed a little interest, paid some money on a piece of land my brother owned. He wanted me to have my brother make a deed to the place. I objected. He got mad and cross, and cursed around and said lots of things. For three days he wouldn't come in to eat. Occasionally he would come in between meals and go to the cupboard and get something to eat. I have come in and asked him if he found anything. He would say: 'What in hell does it make any difference to you? You don't care a damn bit about me. Go pet your brother.'

"Q. How long would he go that way, without speaking to you?

"A. A week or so. He wouldn't speak unless I asked him something. Then he would curse, or else not answer when I spoke to him. It was a common thing, a frequent occurrence, and sometimes it would be more than a week, as long as three. We lived in one place, it was an old shed, and the door had nothing but a block nailed there for a latch, and he would come and kick on the door, and not ask me to open the door, and if I didn't get there in time he would kick until he knocked the door loose. That is the way he let himself in, lots of times.

"Q. What could you say as to him scolding you during the last three or four years, how he spoke to you, if at all?

"A. Well, he would get cross and scold, and lots of times go on about something I had done, saying why in hell I didn't have sense enough to do it some other way, and looked like I ought to know enough. Maybe leave me with the chores to do, and I would do them the best I could, and after he came home, I hadn't done them to suit him, and he would say why in hell didn't I know enough to do them some other way, and it looked like I would have sense enough to know a few things. * * He would come in to his meals. I

always tried to have them on time; sometimes he would put the clock back a few minutes, and I wouldn't know it, and dinner wouldn't be quite ready, then it would be, 'Damn it, what in hell have you been doing?' ''

The plaintiff testified that, though she desired the defendant should not incur any indebtedness, he negotiated for prunes growing in an orchard, agreeing to pay for the fruit when it was harvested, and that he gathered and sold the crop, but did not pay for it. She further stated upon oath that her husband sold a pair of horses that were mortgaged, and was arrested for the offense; that the defendant frequently drank intoxicating liquor, and on one occasion he became so much under the influence of the alcoholic beverage that he vomited on the floor of their dwelling. Mr. Coos habitually used profane and indecent language in the presence and hearing of his wife and daughter until the latter commenced repeating her father's irreverent expressions. The mother testified on this subject that when the little girl would get in his path he would say to her: ''God damn you, get to hell out of my way''; that he would use in their hearing utterances that are set forth in the transcript, but which are too obscene to be repeated in an opinion; that he would tell Margaret he didn't want her to obey her mother, saying to the latter: ''You haven't got as much sense as the child.'' In answer to the court's inquiry on direct examination as to what the defendant had called her, the plaintiff testified:

''He never applied a curse directly to me until I told him I was going to leave, and then he said, 'God damn it to hell,' if I wanted to go, he wouldn't stop me. He said I was nothing but a 'damn low son-of-a-b——h.' He repeated that several times.''

She further testified on this subject:

"He never applied his curses direct to me only the one time more than to say, 'Get your damned head out of the way,' or 'your damned arm out of the way.'"

Another question by the court was:

"Do you think it would be impossible for **you and** your husband to adjust your differences?"

She replied:

"It certainly would. I tried six years to get along the best I could. It was simply impossible. I stayed on account of the child; I thought, perhaps, he would get better on her account, but he didn't. I simply saw that if I expected anything from her I had to get away; if it had not been for the bad effect on the baby —no matter for myself—if it hadn't been it would have ruined the child, I would have stayed."

In referring to the defendant Mrs. Coos further testified:

"I remember once, he sat around the house most of the day—it was in the winter, I remember. He sat around the house most all day. He wasn't working. There was nothing but a few chips around the barn. He didn't come back from the barn after dinner. There was very little wood for the heater, and nothing at all for the cookstove. The next morning, of course, there was no wood. He wanted to know if there wasn't any, and I said, 'No,' he didn't get any before he went to bed. He wanted to know, 'why in hell I didn't get out and pick up some chips.' There was absolutely nothing to burn. I had to ask him to cut up some of the sticks to burn in the heater. I got out after a while—he sat by the fire—and I went out in the field below the house and hunted up some old water-soaked boards, and found some with pitch in them and managed to get a fire and get breakfast."

On cross-examination the plaintiff was asked:

"Isn't it a fact, Mrs. Coos, that your whole difficulty and trouble lay in the fact that he didn't provide you

with clothes and wearing apparel such as you thought you deserved?"

She answered:

"No, it wasn't that.

"Q. That had nothing to do with it?

"A. I could have put up with the poverty, if things had been all right otherwise. I didn't like his treatment of me and the child.

"Q. Treatment—what do you mean by treatment?

"A. He was always cross and ugly. I couldn't do anything to please him. When he would come into the house, just the least little thing would cause him to fly to pieces, and curse and be angry. That is the way it went all the time."

The plaintiff's sworn declarations as to the defendant's habitual profanity and his frequent use of indecent language in the presence and hearing of her and their child is corroborated by the testimony of Mrs. Coos' sister and brother.

The defendant testified:

"I never in my life misused my wife that I am sure of. As far as swearing at her for instance, I never cursed my wife no place, no where, no time, never did.

"Q. Did you, your baby?

"A. Never did. In a way I did this: I have told my baby when she would be in the way—she was always with me if I was around the house any place, around where she could be—'Damn it, get out of the way; what are you doing here?' That was frequent with me, but the kid never paid no attention to it."

Denying the use of obscene language so attributed to him by the plaintiff, her brother and sister, the defendant testified:

"If that was ever done it was unbeknown to me. I swear very often, and I did swear at the home or any place else, as a rule. It is a habit, and used very frequent, but as far as using language that I have been accused of using and as frequent as they say, well I

probably have used the language they say when I would be out away from the house, but if I used it in the presence of my baby or anybody else, I never knew it. I have used that language, the chances are, when I would be outside.

"Q. Away from home?

"A. Yes; but as far as using that kind of language in the house, or close to the house, I deny it. I never did it."

The court inquired:

"Did you ever hear the little girl use bad language?"

The defendant replied:

"I heard my little girl one time try to swear. That was just at the time she first begun to talk, you know. She tried to say, 'Damn it.' I told my wife, and she shamed me—told me I ought to be ashamed, and said, 'You ought to quit that.' We laughed about it at the time, it was kind of funny to hear the kid try to say that—she couldn't say it, you know. She [the plaintiff] scolded her [the child] for it. That stopped that part of it all right enough. I never heard her [the daughter] try to use it more than a couple of times."

In answer to the court's question: "Did you ever use the words, 'son-of-a-b——h' in the presence of your daughter or wife?" the defendant replied: "Well, I expect probably I did. I never called either of them that, but I used the word a number of times."

Mr. Coos further testified that after his marriage he never gambled but once; that when he vomited on the floor he had been ill, and, having taken a bottle of ginger ale, the liquid nauseated him, and that since his marriage he had not spent for alcoholic beverage more than $5.

The foregoing is deemed to be a fair presentation of the material testimony relating to the cause of suit relied upon by the plaintiff as entitling her to a di-

vorce. A perusal of the evidence hereinbefore detailed will show that the defendant never assaulted the plaintiff or threatened her with any violence. His habitual use, however, of profane and obscene language evidently so shocked the plaintiff's moral sense and wounded her feelings to that extent that she believed if her daughter was to be raised to virtuous womanhood, it was necessary to take the child from her father's contaminating influence. It does not appear that the plaintiff was a member of any church or that she had been reared in the home of religious people. No testimony was offered tending to show that the plaintiff ever used profane language. The hope cherished for the future welfare of the daughter, and the fear entertained by the evil consequences upon her of the defendant's loathsome language, must have caused the plaintiff grievous mental suffering, rendering her life burdensome. A text-writer in discussing this subject remarks:

"The habit of a husband of cursing and swearing at his wife and using vile and indecent language, especially in the presence of the children or third persons, is a material consideration, together with the other circumstances of the case, to show cruelty": 9 R. C. L. 344.

See, also, 14 Cyc. 608; *Mosher* v. *Mosher,* 16 N. D. 269 (113 N. W. 99, 125 Am. St. Rep. 654, 12 L. R. A. (N. S.) 820). Carefully considering all the circumstances adverted to, it is believed the charge of cruel and inhuman treatment as alleged in the complaint has been fully substantiated.

The decree will therefore be reversed, and one entered here granting the plaintiff a divorce and awarding to her the care, custody and control of the minor child, Margaret Coos. The cause will be remanded,

however, to the lower court to take further testimony, if necessary, and to make an order requiring the defendant to contribute at stated intervals such reasonable sum as may be determined upon for alimony and the support of his daughter.

REVERSED AND REMANDED.

MR. CHIEF JUSTICE MCBRIDE, MR. JUSTICE BEAN and MR. JUSTICE MCCAMANT concur.